**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| **WILLISTON BASIN INTERSTATE PIPELINE COMPANY,** | ) | **CIVIL ACTION NO. 1:09-cv-034** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **WILLISTON BASIN'S** |
| | ) | **MOTION TO COMPEL** |
| **FACTORY MUTUAL INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

Pursuant to Fed. R. Civ. P. 37(a) and the Court's Order dated July 9, 2010, Williston

Basin Interstate Pipeline Company ("Williston Basin") moves to compel Factory Mutual

Insurance Company ("FM") to respond to its Requests for Production ("RFPs") Nos. 24, 26 and

30-33 and Interrogatories ("Ints") 10 and 12.  Williston Basin files this Motion at the direction

and with the permission of the Court as ordered during the conference with the Court held on

July 6, 2010.

Counsel for Williston Basin hereby certifies pursuant to Local Rule 37.1 that it has

conferred in good faith with counsel for FM to resolve this dispute without intervention of the

Court, as required by D.N.D. Civ. L.R. 37.1(A) and Fed. R. Civ. P. 37(a)(1).   These

communications include letters from Williston Basin's counsel to FM's counsel dated May 21,

2010 (two letters), June 3, 2010, and June 18, 2010 (attached hereto as Exhibits 1-4), and

discussions between counsel by telephone and in person.

**BACKGROUND**

Williston Basin asserts claims against FM for breach of insurance contract and bad faith.

In support of this Motion To Compel, Williston Basin incorporates by reference the factual

background provided by its counsel on the record at the July 6 conference with the Court and in

the attached Exhibits 1-4.

By this Motion, Williston Basin seeks an Order compelling FM to provide discovery of:

- FM's amendment of its standard form policy ("Global Advantage Policy") in 2007 to define "occurrence" (RFPs 30-31).  The discovery requests and FM's responses thereto are attached as Exhibit 5.  The portion of the Global Advantage Policy containing the definition of occurrence that FM added in 2007 is attached as Exhibit 6.

- FM's drafting of the "Policy Commentary" prepared in 2009 and distributed to its policyholders in 2010 (RFPs 32-33).  The discovery requests and FM's responses thereto are attached as Exhibit 5. Williston Basin attaches hereto as Exhibit 7 selected pages of the policy commentary discussing the definition and application of the term "occurrence".

- Documents showing the positions taken by FM in disputes with other policyholders where the meaning of "occurrence" or the number of occurrences were in dispute (RFPs 24 and 26 and Ints 10 and 12).  The discovery requests and FM's responses thereto are attached as Exhibit 8.[1]

Williston Basin attaches as Exhibit 9 a copy of General Change Endorsement No. 5 to

Williston Basin's 2003 insurance policy with FM, which amended Williston Basin's natural gas

insurance coverage effective July 11, 2003.  Williston Basin attaches as Exhibit 10 Williston

Basin's Insurance Policy with Factory Mutual for the policy year 2004, which includes the

---

[1] During the July 6 conference with the Court, the parties discussed additional of Williston Basin's discovery requests to which FM had refused to respond.  Williston Basin's understanding of the resolution of those discussions is that FM agrees to produce the following documents in accordance with Williston Basin's discovery requests:  (i) documents regarding FM's underwriting of the natural gas storage coverage for FM policyholder, Aquila, Inc. (RFP 46); (ii) reinsurance policies and communications with reinsurers regarding the gas loss coverage that FM provided to Williston Basin and Williston Basin's claim for coverage for gas loss (RFPs 18-19); (iii) any documents not previously produced regarding the elimination of Williston Basin's gas loss coverage from the FM policy in 2007 (RFP 20); (iv) documents reflecting FM's marketing and advertising of its insurance services (RFP 27 as narrowed by Williston Basin in its letter to FM dated June 3, 2010); and (v) any documents regarding the drafting, meaning, or application of the policy provisions regarding "insured location" or "mysterious disappearance", which FM has agreed to produce but has not provided (RFPs 34-38 and 40-41).  To the extent that FM does not agree that the foregoing matters were resolved at the July 6 conference in the manner stated in the previous sentence, Williston Basin moves for an Order compelling production.

natural gas coverage as Additional Coverage "O" (pg. 19).  The 2003, 2005 and 2006 policies

(which are not attached) are identical in the respects relevant to this motion to the 2004 policy.


## ARGUMENT

I.      **WILLISTON BASIN'S DISCOVERY REQUESTS SEEK RELEVANT INFORMATION.**

Williston Basin incorporates by reference the factual and legal grounds supporting this

motion set forth in its letters to FM's counsel regarding the discovery requests at issue.  (Exs. 1-

4.)[2]  As further described in Exhibits 1-4, Williston Basin's disputed discovery requests are

reasonably calculated to lead to the discovery of admissible evidence regarding the meaning of

disputed policy terms in the event that they are found to be ambiguous.  The discovery that

Williston Basin seeks is also relevant, whether or not the disputed provisions are ambiguous, to

assess whether FM's position regarding the application of those provisions in this case is

consistent with its position in factually similar situations.  Evidence that FM has adapted its

application of the definitions based upon its economic interests with respect to each claim, as

opposed to consistently applying the language from case to case, is relevant and admissible on

the issues of credibility and bad faith without regard to whether the policy language is ultimately

found to be ambiguous.

FM argues that the requested information is irrelevant and not discoverable because the

policy language is clear and unambiguous.  The Court has not at this stage of the case issued any

ruling on whether the contract provisions at issue in Williston Basin's requests – the definition of

"occurrence" for example – are either ambiguous or unambiguous.  Williston Basin has not yet

taken a position on this issue and seeks the discovery in question in part to evaluate whether the

---

[2]  The Court's July 7, 2010 Order authorizes Williston Basin to attach and incorporate the arguments asserted in its letters to FM's counsel attached hereto.  The deposition testimony cited in the letters is attached as Appendix A.

policy may be ambiguous.  The test for ambiguity under North Dakota law is whether reasonable arguments can be made for different meanings of a contract provision.  *See Grinnell Mut. Reinsurance Co. v. Lynne*, 686 N.W.2d 118, 125 (N.D. 2004) ("An ambiguity exists when good arguments can be made for two contrary positions about the meaning of a term in a document.") (quoting *Fisher v. Am. Family Mut. Ins. Co.*, 579 N.W.2d 599 (N.D. 1998)); *Kief Farmers Coop. Elevator Co. v. Farmland Mut. Ins. Co.*, 534 N.W.2d 28, 32 (N.D. 1995) (stating that a contract is ambiguous when "the language can be reasonably construed as having at least two alternative meanings").  The subject requests seek, among other things, to discover FM's internal discussions of the meaning of the policy provisions, which may address whether multiple meanings were considered and thought to be reasonable, whether FM has taken different positions over time regarding the meaning of the subject language, which also would provide an indication that more than one reasonable meaning may exist for the disputed provisions, and whether FM has a reasonable basis for adopting a meaning different from what Williston Basin may have understood, which could also bear on ambiguity.

The discovery requests are also reasonably calculated to lead to the discovery of admissible evidence regarding the meaning and application of the policy language in the event it is found to be ambiguous.  *See Citizens State Bank-Midwest v. Symington*, 780 N.W.2d 676, 686 (N.D. 2010) (evidence of intent is admissible at trial to aid in the interpretation of ambiguous contract terms).  Where, as here, the Court has not yet made a determination regarding ambiguity, the normal and appropriate procedure is to permit discovery of the meaning of policy language and to assess its relevance and admissibility once the Court has made the necessary legal rulings.  *See Travelers Cas. & Sur. Co. v. Ribi Immunochem Research, Inc.*, 108 P.3d 469, 480-81 (Mont. 2005) (affirming the District Court's imposition of sanctions on the insurer for its

refusal to provide discovery of drafting history, even though the disputed language was ultimately found to be unambiguous); *Young v. Liberty Mut. Ins. Co.*, No. 3:96-CV-1189 (EBB), 1999 WL 301688, at \*5 (D. Conn. Feb. 16, 1999) ("To facilitate a full understanding of the meaning of an insurance policy's terms, many courts have allowed discovery of the drafting history and interpretations of standard form CGL policy language, reinsurance information, and other insureds' claims.") (internal citations omitted); *Viking Yacht Co. v. Affiliated FM Ins. Co.*, No. 9:07-cv-80341-KAM, Doc. No. 47 at 4 (S.D. Fla. Feb. 7, 2008) ("Contrary to AFM's position, drafting history and extrinsic evidence of interpretive materials is discoverable at this early stage of the litigation when questions concerning ambiguity have not been resolved.") (Order granting Motion To Compel in part and denying in part attached as Exhibit 11).   In view of decisions in other jurisdictions, a realistic possibility exists that the Court may ultimately determine that one or more of the terms at issue are ambiguous.  *See, e.g.*, *Am. Family Mut. Ins. Co. v. Wilkins*, 179 P.3d 1104, 1110 (Kan. 2008) ("Because the policy at issue in this case does not define the term 'occurrence' and the cases from various courts demonstrate that the term 'occurrence' is susceptible to conflicting meanings, we find the term to be ambiguous.").

Williston Basin's discovery requests also seek information relevant to the issue of whether FM has acted consistently and in good faith in construing and applying the applicable policy language.  Evidence of how an insurer *applies* policy language in factually similar situations is admissible without regard to whether the language in question is ambiguous for at least two reasons.  First, to the extent that FM takes the position that its policy language means different things in similar situations (particularly if the difference in position can be attributed to FM seeking to apply the language in a way that will advance its own economic interest in each situation), the evidence can be used to attack FM's credibility and show that its position

5

regarding the application of policy language to Williston Basin's claim should not be believed. Such evidence does not constitute an inadmissible statement of the meaning of a provision and is instead admissible as a prior inconsistent statement of position regarding the application of policy language to an analogous set of facts.  Second, evidence that FM applies a results-oriented approach in which it fails to adopt and adhere to a consistent position regarding the application of policy language in similar situations is relevant to show bad faith.  *See, e.g.*, *Diebold, Inc. v. Cont'l Cas. Co.*, Civil Action No. 07-1991 (JEI), 2008 WL 1372948, at *6 (D.N.J. Apr. 10, 2008) ("Diebold asserts that Continental wrongfully denied coverage and acted in bad faith by … assertion of coverage positions during claims handling that are different from the coverage positions asserted during underwriting.  These facts, if proven true, would establish that Diebold's entitlement to coverage under the policy was not 'fairly debatable,' and there could be no 'bona fide dispute over coverage.'") (internal quotations omitted).

There is reason to believe that FM has evidence of the positions it has taken or considered regarding the application of the term "occurrence" to similar factual situations.  For example, FM's Policy Commentary presents examples of the application of its definition of "occurrence" to various situations.  (Ex. 7 at 5-6.)   Williston Basin seeks to discover the background documents concerning and further explaining the positions taken in these examples as well as other instances of the application of the definition that may not have been included in the Policy Commentary.   Similarly, FM's position on the meaning and application of "occurrence" in disputes with other policyholders is also likely to lead to evidence of FM's conflicting positions. Williston Basin has identified three examples in the reported cases where FM argued that related events constituted separate occurrences in order to maximize the number of deductibles.  (Ex. 3 at 2-3.)  In one such case, FM argued that an event is not a single occurrence merely because it is

part of a "common plan or scheme".  (*See* Ex. 12 at 6.)  In another case, FM asserted that an employee's scheme to damage a database belonging to its employer, which consisted of 171 similar or identical acts of sabotage by the same employee over a year's time, constituted 171 separate occurrences.  (*See* Ex. 13 at 3.)  FM denied coverage because the damage from each instance of sabotage failed to meet the applicable policy deductible.  These positions contradict the arguments that FM has made in this case.  Williston Basin both seeks to fully discover the positions that FM has taken in these three cases as well as to discover additional situations in which FM's coverage positions contradict its arguments here or are results oriented (*i.e.,* that FM advocates the interpretation most favorable to its own economic interest), rather than being based upon any principled policy interpretation.  (Legal authority supporting Williston Basin's position is cited in Exhibit 3 at 3-4 (*see, e.g., Young*, 1999 WL 301688, at *5).)[3]

FM's arguments at the July 6 conference regarding the number of occurrences and policy trigger only serve to emphasize the relevance of the discovery requests at issue.  FM contends that only the 2002 policy applies to Williston Basin's insurance claim because Howell/Anadarko began production in 2002 and subsequent wells in 2003 and 2004 (drilled in different areas and

---

[3] The evidence that Williston Basin seeks will also be relevant in the event that the Court determines the policy is ambiguous with respect to the meaning of "occurrence."  Evidence of a party's position on the meaning of a contract term prior to the time that a dispute arose is particularly relevant evidence of contract meaning.  *See Rosemann v. Roto-Die, Inc.*, 377 F.3d 897, 902 (8th Cir. 2004) (contract terms may be interpreted in light of the contracting party's own prior interpretation of the contract); *Minn. Mut. Life Ins. Co. v. Wright*, 312 F.2d 655, 660 (8th Cir. 1963) (affirming the admission of an insurer's prior explanation to third party of policy interpretation under a form contract); *Thomson v. Thomson*, 156 F.2d 581, 586 (8th Cir. 1946) (practical interpretation of policy by a party is entitled to "great if not controlling influence") (citing *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100 (1913)). In addition, an insurer has an obligation to construe ambiguous policy language in favor of the insured.  *See Corwin Chrysler-Plymouth, Inc. v. Westchester Fire Ins. Co.*, 279 N.W.2d 638, 642 (N.D. 1979) ("If one interpretation of the policy language will impose liability on the insurer and the other will not, the interpretation favorable to the insured will be adopted.").  An insurer acts in bad faith if it construes ambiguous policy language against the insured.  *Id.* at 644 (affirming judgment against insurer for bad faith where ambiguous policy language "foreclosed any possibility that [the insurer] would prevail if litigation ensued.").  FM's internal discussions regarding the meaning and application of the policy language and its application of that language to deny claims of other policyholders are particularly relevant where, as here, the policy language defines both the policy limits and deductibles in terms of occurrences such that the insurer has a financial incentive to apply the policy language in an inconsistent or contradictory manner depending on the circumstances.

on distinct prospects) were not separate events of loss.  FM takes this position in an effort to invoke an exclusion for "cushion gas" contained in the 2002 policy and eliminated from the subsequent policies.  Williston Basin's discovery requests are reasonably calculated to lead to the discovery of admissible evidence that the policy language and terms can reasonably be construed contrary to the manner advocated by FM, and that FM knew it was improperly construing the policy language against its insured when it denied the insurance claims at issue.

Thus, FM's relevance objections to the discovery requests at issue fail.

## II. RULE 407 DOES NOT PROVIDE A BASIS FOR WITHHOLDING ANY OF THE REQUESTED DOCUMENTS.

FM's reliance on Rule 407 to resist the discovery in question likewise has no merit.  FM argues that changes to its standard policy language, including the addition of a definition of "occurrence", were made after the years in which Williston Basin purchased coverage and are subsequent remedial measures that Fed. R. Evid. 407 renders inadmissible.  FM denies Williston Basin's discovery requests on this ground.

In its letter dated June 18, 2010, Williston Basin responded in detail to FM's attempted reliance on Rule 407 as a basis to avoid production of the requested documents.  (*See* Ex. 4 at 1-5.)  As an initial matter, Rule 407 is a rule of admissibility, not discovery, and thus does not protect evidence of subsequent remedial measures from discovery.  (*Id*. at 1-2.)

With regard to admissibility, the Eighth Circuit recognizes that Rule 407 does not apply to breach of contract claims. *R.W. Murray, Co. v. Shatterproof Glass Corp.*, 758 F.2d 266, 274 (8th Cir. 1985) (refusing to apply Rule 407 in a breach of warranty case because "Rule 407 is, by its terms, confined to cases involving negligence or other culpable conduct" not involved in a breach of contract claim) (internal citations omitted) (*see also* Ex. 4 at 2).  Williston Basin's assertion of a claim for bad faith does not change the analysis because where, as here, evidence

is admissible for one purpose (on a contract claim), the fact that it might not be admissible for a different purpose (on a tort claim) does not preclude its admission and certainly does not make it undiscoverable.  (*See* Ex. 4 at 2-3.)

Moreover, Rule 407 applies only to *subsequent* remedial measures, that is, measures taken after a plaintiff has been injured by a dangerous condition.  The timing and facts here do not fit the situation to which Rule 407 applies.  Williston Basin's claims arise from FM's rejection of coverage in July 2009, but FM took the so-called "subsequent" remedial measures that it seeks to avoid having discovered beginning in 2007.  (Ex. 4 at 3.)  There is also no evidence that FM took the actions in question in response to Williston Basin's claim for coverage.  To the contrary, FM adopted the definition in response to the decision in the World Trade Center coverage cases and not because of anything relating to Williston Basin's claim for coverage.  Rule 407 does not apply for this reason as well.  (Ex. 4 at 3-4, outlining applicable case law and the reasons unrelated to Williston Basin for which FM admits it changed its "occurrence" definition.)

Finally, disallowing evidence of FM's claimed "remedial measure" does not advance the policy behind Rule 407.  Rule 407 exists to encourage parties to take remedial action necessary to prevent repetition of injury, but FM's witnesses have testified that the definition of "occurrence" was added to the policy not to prevent additional injuries caused by breach of contract, but rather in response to the insurance litigation that followed the terrorist attacks on the World Trade Center.  Where, as here, the policy goals behind Rule 407 would not be advanced by the exclusion of evidence, courts have rejected its application.  (Ex. 4 at 3-4).

### III.   FM'S ARGUMENTS REGARDING BURDEN ARE INSUFFICIENT TO AVOID THE REQUESTED DISCOVERY.

#### A. FM Has Not Met Its Burden To Show That The Document Production Would Be Unduly Burdensome.

FM asserted at the July 6 conference that identifying insurance claims of other policyholders where the definition of "occurrence" was at issue would be unduly burdensome. This objection is neither adequately supported nor a complete bar to the discovery of the requested information.

As the objecting party, FM has the burden of showing that the "task of producing or answering is unusual, undue or extraordinary," *Factory Mut. Ins. Co. v. Neb. Beef, Inc.*, No. 8:09CV159, 2010 WL 1553458, at *2 (D. Neb. Apr. 15, 2010).  The required showing must be more than that responding will be difficult, inconvenient or time consuming.  An undue burden is one that is particularly great due to no fault of the responding party.  (Ex. 3 at 4.)

FM has not supported its claim of undue burden.  The mere fact that FM does not maintain a searchable database is not sufficient.  Courts have routinely held that the fact that a party has a "record keeping system which requires it to incur heavy expenditures of time and effort to produce requested documents is an insufficient reason to prevent disclosure of otherwise discoverable information." *Wagner v. Dryvit Sys., Inc.*, 208 F.R.D. 606, 611 (D. Neb. 2001); s*ee also, e.g., Sunnen Prods. Co. v. Travelers Cas. & Sur. Co. of Am.*, No. 4:09CV00889 JCH, 2010 WL 743633, slip copy (E.D. Mo. Feb. 25, 2010); *Kelly v. Montgomery Lynch & Assocs., Inc.*, No. 1:07-CV-919, 2007 WL 4412572 (N.D. Ohio Dec. 13, 2007); *Steinbach v. Credigy Receivables, Inc.*, No. Civ.A. 05-114-JBC, 2006 WL 1007272, at *5 (E.D. Ky. Apr. 14, 2006) ("The fact that defendants apparently maintain no record of claims made against them should not operate to relieve defendants of providing plaintiff with relevant information to which she is entitled under the discovery rules.  Defendants' failure to maintain the requested information is

of no consequence and should not shift the burden to plaintiff to discover this information."); *Segarra v. Potter*, No. CIV-02-1413 JB/LFG, 2004 WL 3426438 (D.N.M. Apr. 5, 2004).

FM is also not excused from conducting a reasonable search for the records by the fact that certain of its adjusters are no longer employed by the company. FM can easily send an email to current claim adjustment employees asking them to identify by memory any disputed claims in which the definition of occurrence or number of occurrences were at issue. Because such an email has not been sent, FM cannot reliably estimate for the Court the number of claim files for which it would need to search for responsive documents and information. FM can likewise inquire of its legal department about proceedings (litigation or arbitration) with policyholders in which the definition of "occurrence" or number of occurrences were disputed.

FM's vague assertions of burden fail to satisfy its burden of proof to show that the requests are unduly burdensome. The Court should reject FM's objection on this basis.

**B. Williston Basin's Proposal To Narrow FM's Search For Responsive Documents.**

At the July 6, 2010, conference, the Court invited the parties to submit proposals to limit the discovery request in the event the Court decides the request is unduly burdensome as drafted. Williston Basin presents its alternative proposal without waiver of its arguments, stated above, that FM has failed to carry its burden to establish that the requests as presented are unduly burdensome.

Decisions in other cases support the argument that even if FM had made a valid showing of undue burden, it cannot avoid all discovery of the requested information. *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 106-07 (D.N.J. 1990) (granting plaintiff's motion to compel information relating to the manner in which the insurer has handled claims of other insureds despite insurer's "genuine argument for burdensomeness"). Rather than preventing the

11

discovery, courts faced with a valid burden objection (and showing of burden) limit the scope of the discovery to be produced rather than denying discovery altogether.  *See, e.g., Id.* at 107; *Sunnen*, 2010 WL 743633, at *4 (limiting discovery).  Williston Basin suggests that FM should be required, at a minimum, to ask its in-house counsel to search FM's legal department for responsive documents.  FM's legal personnel can be asked without undue burden for their recollections of cases in which the definition of "occurrence" or number occurrences were at issue in cases involving intentional tort, conversion, theft or misappropriation, such as that involved in the Hewlett-Packard case attached as Exhibit 13.  Searching the legal department's files (a defined and contained collection of materials) for such materials is also reasonable and not burdensome.  In the event that responsive materials are identified (either through the recollection of in-house counsel or the search of legal department files), the relevant court or arbitration filings (briefs and other filings discussing the facts of the case and FM's position on the number of occurrences) should be produced.  At a minimum, FM should be required to produce the relevant court filings from the three cases that Williston Basin has identified. (*See* Ex. 3 at 2-3.)  Certain materials relating to FM's denial of the insurance claims at issue in those proceedings were filed under seal or are otherwise unavailable in the court file.  Williston Basin has already done the work of identifying these cases; FM can easily obtain the relevant materials from legal department files or outside counsel in those cases.

## CONCLUSION

For the foregoing reasons, Williston Basin respectfully requests the Court to compel FM to provide the discovery sought by RFPs 24, 26 and 30-33 and Ints 10 and 12.

Dated:  July 13, 2010      Respectfully submitted,


           /s/ Bruce A. Featherstone
           Bruce A. Featherstone
           John A. DeSisto
           FEATHERSTONE PETRIE DESISTO LLP
           600 17th Street, Suite 2400S
           Denver, Colorado 80202-5424
           Telephone:  303-626-7100
           Facsimile:   303-626-7101
           bfeatherstone@featherstonelaw.com
           jdesisto@featherstonelaw.com

           and

           James S. Hill, ND ID# 03158
           Rebecca S. Thiem, ND ID# 03693
           Zuger Kirmis & Smith
           316 North 5th Street
           P.O. Box 1695
           Bismarck, North Dakota 58502-1695
           Telephone:  701-223-2711
           Facsimile:   701-223-7387
           jhill@zkslaw.com
           rthiem@zkslaw.com

           *Attorneys for Plaintiff*
           *Williston Basin Interstate Pipeline Company*

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2010, the foregoing document entitled **WILLISTON BASIN'S MOTION TO COMPEL** was filed electronically with the Clerk of the Court using the Court's Electronic Court Filing (ECF) system and that ECF will send a Notice of Electronic Filing (NEF) to the following parties:

Steven A. Storslee
Chris A. Edison
STORSLEE LAW FIRM, P.C.
1900 Burnt Boat Drive, Suite 101
P.O. Box 4007
Bismarck, North Dakota 58502-4007
sstorslee@storsleelaw.com
cedison@storsleelaw.com

Terrence R. Joy
David S. Evinger
Daniel W. Berglund
Richard B. Allyn
ROBINS, KAPLAN, MILLER & CIRESI LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota  55402
trjoy@rkmc.com
dsevinger@rkmc.com
dwberglund@rkmc.com
rballyn@rkmc.com

 /s/ Heidi Roehrs
Heidi Roehrs