**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Williston Basin Interstate Pipeline Company, | ) ) ) | |
| Plaintiff, | ) ) | **ORDER RE MOTIONS TO COMPEL** |
| vs. | ) ) | Case No. 1:09-cv-034 |
| Factory Mutual Insurance Company, | ) ) | |
| Defendant. | ) | |

_____

Before the court are motions to compel discovery by plaintiff Williston Basin Interstate

Pipeline Company ("WBI") and defendant Factory Mutual Insurance Company ("Factory Mutual").

I.      **INTRODUCTION**

WBI is a producer and transporter of natural gas.  It maintains its principal place of business

in Bismarck, North Dakota and is an affiliate of MDU Resource Group, Inc. ("MDU"), which is also

headquartered in Bismarck.  Since approximately the late 1940's, WBI has been storing natural gas

in the Elk Basin Storage Reservoir ("EBSR"), a federally-certificated underground natural gas

storage reservoir that straddles the Wyoming-Montana border near Powell, Wyoming.

WBI contends that, in January 2006, it obtained information which lead it to believe that

four natural gas wells drilled in the vicinity of the EBSR by an entity referred to by the parties as

"Howell/Andarko" were producing and converting gas from the EBSR.  The four wells were drilled

on various dates from 2002 through 2004.  WBI sued Howell/Andarko in Wyoming state court to

recover the converted gas and settled that litigation in July 2009, recovering approximately 8.3 Bcf

of the approximately 13.3 Bcf that WBI claims it lost.

1

During the period from 2002 through 2006, MDU purchased property and casualty coverage from Factory Mutual on a yearly basis with WBI being an additional insured. For the years 2003-2006, there was coverage for the loss of stored gas at the EBSR on a "per occurrence" basis subject to certain limits and deductibles. There was also coverage in 2002, but Factory Mutual claims that an exclusion for "cushion gas" bars recovery for any of WBI's claimed losses that occurred beginning in 2002.[1]

WBI claims that its insurance broker, Marsh USA, Inc. ("Marsh"), gave notice to Factory Mutual in August 2006 of the occurrence of gas loss from the EBSR as a result of production from the Howell/Andarko wells. Beginning in August 2007, WBI and Factory Mutual entered into a tolling agreement, which was subsequently modified and extended, but the terms and scope of which are now disputed.

In June 2009, WBI submitted a proof of loss to Factory Mutual for the claimed loss of gas from the EBSR, which was later amended to reflect the results of the settlement with Howell/Andarko. Factory Mutual denied coverage, asserting a number of policy defenses, including that any loss of gas from EBSR caused by the Howell/Andarko wells was a single occurrence that began in 2002 before WBI had property coverage for the gas that Factory Mutual claims is at issue.

In is complaint in this case, WBI seeks a declaration and order that Factory Mutual is obligated to reimburse it for (1) the loss of approximately 5 Bcf of natural gas from the EBSR that it claims was produced and converted by the four Howell/Andarko wells and for which it was not compensated by its settlement with Howell/Andarko and (2) certain costs and expenses that it

---

[1]  The exclusion for "cushion gas" was deleted from the Factory Mutual policies beginning in 2003. Factory Mutual claims WBI sought this deletion because it was aware of the possibility that "Howell/Andarko" might be draining gas from the reservoir and failed to disclose this to Factory Mutual.

incurred as result of the claimed losses to continue normal operations at the EBSR.  In addition, WBI claims that Factory Mutual committed a number of breaches of its duty of good faith and fair dealing, including that its denial of coverage was made in bad faith.

## II.   FACTORY MUTUAL'S MOTION TO COMPEL

### A.   Redactions from the diaries and project summaries of Mark Baerlocher

Factory Mutual complains about the redactions made by WBI to the project diaries and summaries of Mark Baerlocher, a WBI engineer who had supervisory responsibility for the EBSR. Factory Mutual contends that discoverable information likely has been redacted and that the redactions were improper given the protective order that is in place.

WBI counters that the material it redacted is not discoverable because it relates to other confidential business matters and also, in the case of the diaries, contains information personal to Baerlocher.  WBI also claims that Factory Mutual similarly redacted material it claimed was irrelevant in some of the documents it produced.  WBI claims it has reviewed the material twice to make sure that none of the redacted information is discoverable.

The protective order entered by the court provides a vehicle for the production of confidential information by the parties; it does not compel the production of material that is not discoverable. That being said, the court does not welcome the unilateral editing of documents produced in discovery, particularly when there is a protective order in place, given the suspicion and distrust that it generates, which, in turn, leads to unnecessary discovery disputes and burdensome *in camera* inspections.  When a party has failed to provide  adequate justification for redactions to documents containing discoverable information, the court is empowered to order the documents

produced *sans* the redactions.  See, e.g., Medtronic Sofamor Danek, Inc. v. Michelson, 2002 WL 33003691, **4-5 (W.D. Tenn. Jan. 30, 2002) (citing other cases).

Without deciding whether the justifications proffered by WBI are sufficient here, the court, elects to review the unredacted documents first *in camera* and reserve ruling on whether it will require production of all, or any portions of, the documents in their unredacted form. Consequently, the court **ORDERS** WBI to produce copies of both the unredacted and the redacted project diaries and summaries to the chambers of the undersigned within seven calendar days for *in camera* inspection.

### B.      Marsh documents

Factory Mutual claims that WBI has improperly claimed  attorney-client privilege to  parts or all of  certain documents that were created, reviewed, or received by employees of Marsh,  WBI's insurance broker.  Factory Mutual contends there is nothing in  Marsh's written contract indicating it was hired to provide assistance to WBI's counsel.  Factory Mutual also claims that the privilege logs prepared by WBI do not reflect the involvement of an attorney for a number of the withheld documents, which it claims is necessary for asserting the privilege.  Finally, as to other Marsh documents, Factory Mutual claims WBI's privilege logs do not provide sufficient information to enable it to make a judgment about whether there was a good faith basis for assertion of the privilege.

In response, WBI states that the documents in question contain confidential communications made for the purpose of facilitating the rendition of professional legal services and that MDU's in-house counsel requested Marsh's expert assistance in evaluating  relevant policy language and WBI's claims against Factory Mutual.

The mere fact that Marsh's contract does not cover providing assistance to MDU's counsel does not mean it was not provided.  Further, the cases that Factory Mutual relies upon as requiring that an attorney be involved in a communication before it can be claimed as confidential are inapposite since they are based upon an attorney-client privilege that is narrower in scope than the one that governs here.

During the telephonic hearing, both parties agreed that North Dakota's attorney-client privilege applies, given that this is a diversity action involving state-law claims.  See Fed. R. Evid. 501.  North Dakota's attorney-client privilege is an expansive one.  It includes communications "between representatives of the client or between the client and a representative of the client" if made for the purpose of facilitating the rendition of professional legal services.  N.D. R. Evid. 502(b)(4).

While it appears Marsh's employees did provide assistance to MDU's counsel to facilitate the rendition of legal advice in some cases, the concern here is that Marsh had other involvement in this case, including brokering coverages and putting Factory Mutual on notice of the continuing losses at the EBSR in 2006.  Also, Factory Mutual does have a point with respect to the difficulty of determining from the privilege logs whether a basis exists for the claiming of the privilege for some of the material.  Consequently, the court will exercise its discretion and review *in camera* the Marsh documents claimed as privileged.

In anticipation of the court's ruling, WBI has already forwarded to chambers a number of documents, which the court has not yet had the opportunity to review.   To the extent WBI has not already done so, it is **ORDERED** to produce copies of the privileged documents to the chambers of the undersigned for review.

III.   **WBI'S MOTION TO COMPEL**

A.   **Requests for Production 30 & 31**

1.   **Introduction**

The Factory Mutual policies issued to WBI from 2002 through 2006 did not contain a definition of the term "occurrence."  In Requests for Production 30 & 31, WBI seeks to discover documents relating to a decision by Factory Mutual to include a definition of "occurrence" in the policies issued to WBI beginning in 2007.

While WBI is not claiming coverage under the 2007 policy, it believes the requested discovery may produce evidence bearing upon Factory Mutual's construction and application of the term "occurrence" under its earlier policies as well as evidence acknowledging that the term was susceptible to multiple interpretations.  WBI also believes the requested discovery will show that Factory Mutual has failed to consistently apply the term "occurrence" and has claimed whatever interpretation favors its interests in a particular case over the interests of its insureds.  WBI claims this evidence would be relevant to its "bad faith" claim.

Factory Mutual objects to the requested discovery for the reasons that are discussed separately below.

2.   **Factory Mutual's argument that extrinsic evidence is irrelevant because WBI has not claimed an ambiguity**

Factory Mutual argues the evidence sought in Requests for Production 30 & 31 is irrelevant because, according to it, extrinsic evidence of the meaning of "occurrence" is only relevant if the court first concludes it is ambiguous and WBI has yet to claim an ambiguity.  This argument is flawed for two reasons.

6

First, the fact that WBI has not claimed an ambiguity does not mean the court cannot reach that conclusion on its own.  "When two good arguments can be made for either of two contrary positions as to the meaning of a term in a document, an ambiguity exists."  Garofalo v. Saint Joseph's Hosp., 2000 ND 149, § 7, 615 N.W.2d 160 (citing Sellie v. North Dakota Ins. Guaranty Ass'n, 494 N.W.2d 151, 156 (N.D. 1992).[2]

Second, Factory Mutual oversimplifies the process that may be involved in determining whether an ambiguity exists and the role that extrinsic evidence may play in that determination.  In some jurisdictions, courts will consider, as a matter of normal course, the circumstances in which an agreement is made, the interpretations proffered by the parties, and, on a conditional basis, any extrinsic evidence that supports the proffered interpretations.  See, e.g., In re New Valley Corp., 89 F.3d 143, 149-150 (3rd Cir. 1996) ("Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation.") Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866, 871-872 (9th Cir. 1979) (extrinsic evidence should be considered conditionally to determine whether an agreement is ambiguous under California law, but may not be used to vary the terms of the agreement if it is found to be unambiguous); cf. United States of America v. Basin Electric Power Coop., 248 F.3d 781, 804-805  (8th Cir. 2001) (applying federal common law); see generally 11 Williston on Contracts § 30:5 (4th ed.); Farnsworth on Contracts §§ 7.10-7.14 (3rd ed. 2004).

---

[2]  While the parties have not finally agreed that North Dakota law applies, there appears to be good arguments for its application, except, possibly, for those matters where the parties have agreed in the policy to apply a different state's law.

In other jurisdictions, the law favors looking primarily to the language of the agreement, and how it would be understood in its ordinary and popular sense, and consideration of matters outside the agreement is more limited until it has been determined to be ambiguous.  See, e.g., Air Line Pilots Ass'n, Intern. v. Midwest Exp. Airlines, Inc., 279 F.3d 553, 556 (7th Cir. 2002); Mathews v. Sears Pension Plan, 144 F.3d 461, 466 (7th Cir. 1998); see generally Farnsworth on Contracts, §§ 7.10-7.14.  But, even in the more restrictive jurisdictions, courts will sometimes consider extrinsic evidence in determining whether there is an ambiguity when it appears the parties intended that the disputed language be understood in a technical sense or when there is an indication of a "latent ambiguity." See, e.g., PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 614-615 (7th Cir. 1998); Mathews v. Sears Pension Plan, 144 F.3d at 466-467; cf. Garofalo v. Saint Joseph's Hosp., 2000 ND 149; Thompson v. Thompson, 391 N.W.2d 608 (N.D. 1986).  And, the extrinsic evidence that the courts will consider includes evidence constituting an admission regarding the meaning of a disputed term.  PMC, Inc. v. Sherwin-Williams Co., 151 F.3d at 614 (evidence of trade usage and admissions are "objective" extrinsic evidence that may be considered in determining whether there is a latent ambiguity).  Arguably, it would also include evidence tending to show that the interpretation proffered by the other party is reasonable.

The extent to which extrinsic evidence may be considered in determining whether the term "occurrence" is ambiguous  need not be decided now.  For discovery purposes, it is sufficient that extrinsic evidence may be relevant to the making of that determination.

### 3.      Factory Mutual's claim that "occurrence" is not ambiguous

Factory Mutual also argues that the extrinsic evidence sought by WBI is not needed because, in any event, the meaning of  "occurrence" is plain and easily understood.  Also, at least implicitly,

8

Factory Mutual's further argument is that applying the plain meaning of "occurrence" to the facts of this case results in the conclusion that any production of EBSR gas by the four Howell/Andarko wells constituted a single occurrence and not multiple occurrences as claimed by WBI.[3]

Because we are at the discovery stage, the court will not now resolve whether "occurrence" is ambiguous and whether one, or both, of the competing applications of that term to the facts of this case ( *i.e.*, whether there was single or multiple occurrences) are reasonable.  As already observed, the sought after discovery may be relevant to the ultimate determination of these issues.  Rather, to address Factory Mutual's argument that the requested discovery is a waste of time and resources because there could only have been a single occurrence based upon the plain meaning of "occurrence," it is sufficient for purposes of discovery to determine whether there is any possibility for making a non-frivolous argument to the contrary.

In making its argument that any production of EBSR gas by the four Howell/Andarko wells constituted a single occurrence,  Factory Mutual places significant emphasis upon the alleged fact that the four wells were drilled pursuant to an established plan by Howell/Andarko to produce gas from the Elk Basin.  In support of its contrary argument for multiple occurrences, WBI appears to rely upon the following points - some of which are disputed by Factory Mutual:

- The four Howell/Andarko wells were drilled at different times, in different locations, and do not appear to have all been targeted to produce from the same horizons.

- The loss occasioned by production from a particular well would be limited by a number of factors unique to that well.

_____

[3]  This is because WBI's claim of bad faith premised upon Factory Mutual's alleged inconsistent application of the term "occurrence" is not dependent upon the finding of an ambiguity.

- Even if the drilling of the four wells was pursuant to an overall plan, the drilling of any particular well was not inevitable and there were a number of intervening factors that affected whether or not a particular well was drilled and produced gas from the EBSR.

- The lack of evidence that Howell/Andarko intended to produce gas from the EBSR, as opposed to native gas from nearby formations and horizons.

Absent an argument by either party that a technical or trade definition of the term "occurrence" applies, the law in North Dakota, and probably in most states, appears to favor construing a disputed insurance term in accordance with its commonly understood meaning. E.g., ACUITY v. Burd & Smith Const., Inc., 2006 ND 187, ¶ 7, 721 N.W.2d 33. Frequently, this results in resorting to commonly accepted dictionary definitions. See id. at ¶ 26. Webster's Third New International Dictionary Unabridged  (1965) offers as one of its definitions that "occurrence" is "something that happens or takes place" and that it is synonymous with the terms "incident, episode, event, circumstance." It also states that occurrence "is a general term for taking place or happening and lacks much connotational range" and "may suggest a happening without plan, intent, or volition." Id. Similarly the Oxford English Dictionary (2009) defines "occurrence" as "[a] thing that occurs, happens, or takes place; an event, an incident."

Here, the relevant policies insure against "all risks of physical loss or damage," except as specifically excluded. In the "Limits of Liability" section, the policy states in relevant part:

> The Company's maximum limit of liability in a single occurrence regardless of the number of Locations or coverages involved will not exceed the Policy limit of liability . . . .
>
> * * * *

Limits of liability stated below apply in the aggregate per occurrence for all Locations and coverages involved.

When a limit of liability is shown as applying in the Aggregate During Any Policy Year, the Company's maximum limit of liability will not exceed such limit during any policy year regardless of the number of locations, coverages or occurrences involved.

In the event an occurrence results in liability payable under more than one policy issued to the Named Insured by the Company, or its representative companies, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy regardless of the number of coverages, locations, or perils involved.

(Doc. Nos. 48-3, pp. 2 & 9; 48-5, pp. 2 & 8; 48-7, pp. 2 & 9; 48-9, pp. 2 & 8-9; 48-11, pp. 2 & 8-9)

Considering only this policy language[4] and the dictionary definition of "occurrence," is an "occurrence" simply an event or incident of property damage or loss, regardless of cause and cause being relevant only when there might be an applicable exclusion? Or, is an occurrence an event or incident that *causes* the property damage or loss? And, if the focus is upon the latter, how far back in the chain of causation does one go? For example, in this case, is the production from each of the individual wells a cause of loss, such that an argument can be made there were multiple occurrences - particularly if there was some separation in time and space with respect to the production from the wells? Or, is the production from all of the wells one event or incident because, among other things, they were drilled pursuant to a common scheme or plan?

---

[4] There may be other language in the policy that is relevant to determining the intended meaning of the word "occurrence" and whether or not there is any ambiguity. For example, it appears that at least one of the policies at issue contained the following language in an endorsement related to damage from "terrorism":

Multiple acts of terrorism which occur within a 72 hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one act.

(Doc. No. 48-7, p. 73). An argument might be made that this limiting language would be unnecessary if all loss and damage from a common scheme or plan constituted a single occurrence under the plain meaning of the term "occurrence." In fact, it appears Factory Mutual made this same point in support of an argument for multiple occurrences in another case. (Doc. No. 44-11, p. 11.)

These are not idle questions. <u>See</u> <u>generally</u> Maloney, F., *The Application of "Per-Occurrence" Deductible Provisions in First-Party Property Claims*, 37 <u>Tort & Insurance Law Journal</u> 921 (2002).   For example, the Second Circuit considered similar questions with respect to the 9/11 attacks on the twin towers of the World Trade Center.   It concluded that the attacks constituted a single occurrence under a policy that offered the following definition of the term "occurrence:"

> "Occurrence" shall mean all losses or damages that are attributable directly or indirectly to one cause or to one series of similar causes.  All such losses will be added together and the total amount of such loses will be treated as one occurrence irrespective of the period of time or area over which such losses occur.

<u>E.g.</u>, <u>World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co.</u>, 345 F.3d 154, 160 (2d Cir. 2003).   However, under another policy that did not contain a separate definition for the term, the court concluded the policy was ambiguous as to whether the attacks on the two towers were one or two separate occurrences.  <u>Id.</u> at 183-190.

Also, there are cases that, arguably, may be considered analogous to this one where the courts have reached contrary conclusions regarding the meaning of the term "occurrence." <u>Compare</u>, <u>e.g.</u>, <u>PECO Energy v. Boden</u>, 64 F.3d 852 (3rd Cir. 1995) <u>with</u> <u>Lexington Ins. Co. v. Travelers Indem.Co. of Ill.</u>, 21 Fed.Appx. 585 (9th Cir. 2001) (unpublished per curiam opinion);  <u>Basler Turbo Conversions, LLC v. HCC Ins. Co.</u>, 601 F. Supp. 2d 1082 (E.D. Wis. 2009); <u>see generally</u> 37 <u>Tort & Insurance Law Journal</u> 921 (2002).  This also may bear upon the determination of the reasonableness of the interpretations proffered by the parties in this case.    In summary, Factory Mutual has not demonstrated that the term "occurrence" is so clearly unambiguous that the court at this stage should deny discovery of possibly relevant extrinsic evidence.   And, if the court concludes there is an ambiguity with respect to the term "occurrence," there *may* be a need to

consider extrinsic evidence to resolve it.[5]  This may include evidence of a contracting party's prior construction of the contract, including explanations of its meaning offered to third persons.  See, e.g., Rosemann v. Roto-Die, Inc., 377 F.3d 897, 903 (8th Cir. 2004); Minnesota Mut. Life Ins. Co. v. Wright, 312 F.2d 655, 660 (8th Cir. 1963); Thomson v. Thomson, 156 F.2d 581, 585-586 (8th Cir. 1946).

**4.    Factory Mutual's objection that the discovery is irrelevant because it relates to the 2007 policy which is not in dispute**

Factory Mutual also claims that the requested discovery is not relevant because it relates to policies under which WBI makes no claim. The court disagrees. The inclusion of a specific definition of "occurrence" in the 2007 policy might well shed some light on the meaning of the term in the 2002-2006 policies, which do not define the term.  E.g., Pentair Water Treatment (OH) Co. v. Continental Ins. Co., 2009 WL 3817600, *3 (S.D.N.Y. Nov. 16, 2009) (permitting discovery with respect to similar policies for this reason).  Further, the requested discovery might uncover evidence in which Factory Mutual has expressly addressed  the meaning of  "occurrence" in its earlier policies.

**5.    Factory Mutual's argument that the discovery is irrelevant by operation of Fed. R. Evid. 407**

Factory Mutual also contends that any information from the requested discovery is irrelevant because Fed. R. Evid. 407 makes inadmissible evidence of subsequent policy revisions.  See, e.g.,

---

[5] WBI correctly observes that extrinsic evidence is admissible in contract actions to resolve ambiguities Garofalo v. Saint Joseph's Hosp., 2000 ND 149, § 7.  However, when the contract is one of insurance, it appears North Dakota law prefers, at least in some cases, to simply resolve the ambiguity in favor of the insured.  See, e.g., Sellie, 494 N.W.2d at 157-158; Fisher v. American Family Mut. Ins. Co., 1998 ND 109, ¶ 5, 579 N.W.2d 599.  Whether this is such a case need not now be determined.  For example, where the construction and application of the disputed language is intertwined with and dependent upon the resolution of other disputed facts, there may be an argument for simply leaving the resolution of the ambiguity to the jury.  Cf. World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154 (2d Cir. 2003).

Pastor v. State Farm Mut. Auto. Ins. Co., 487 F.3d 1042, 1045 (7th Cir. 2007).  The court is not convinced.

By its terms, Rule 407 is limited to evidence of subsequent remedial measures which are made following an event that causes injury or harm.  Cf. Dusenbery v. United States, 534 U.S. 161, 172-173 (2002).  And, while there may be other reasons for concluding in a particular case that evidence of a change in policy language should not be admitted (including the substantive law of contracts and/or Rule 401 or 403 grounds), there is nothing in the language of Rule 407 or its commentary that suggests the Supreme Court intended Rule 407 to apply to changes in contract language.  See id; see also All the Chips, Inc. v. OKI America, Inc., 1990 WL 36860, *4 (N.D. Ill. 1990);  cf. R.W. Murray, Co. v. Shatterproof Glass Corp., 758 F.2d 266, 274 (8th Cir. 1985) (holding Rule 407 inapplicable in a breach of warranty action);  Mowbray v. Waste Management Holdings, Inc., 45 F. Supp. 2d 132, 141 (D. Mass. 1999).

However, even if Rule 407 does apply, it has numerous exceptions when the evidence is offered for another purpose, and one of those might be when the evidence is offered to demonstrate there is another reasonable construction of the policy language when that is disputed.  Cf. Dusenbery v. United States, 534 U.S. at 706 (Ginsburg, J. dissenting).  For example, it is doubtful that Rule 407 would bar the court's consideration of evidence that is relevant to the predicate determination of whether an ambiguity exists.  Finally, the requested discovery may refer to other evidence that may be admissible, such as statements made during the time period the policies at issue were in effect regarding the meaning and application of  "occurrence."

In summary, Rule 407 is a rule of admissibility and not one of discovery.  To the extent that it, and similarly reasoned arguments for exclusion of evidence under Rules 401 and 403, prohibits

the use of post-event policy changes as admissible extrinsic evidence of the meaning of disputed policy language, that does not mean the evidence might not be admissible for some other purpose. Also, there is the possibility here that the requested discovery will lead to other evidence that is relevant.

### 6.      Conclusion

Based on the foregoing, it is **ORDERED** that Factory Mutual produce the documents responsive to WBI"s Requests for Production 30 & 31, except those that are attorney-client privileged, within twenty days.

### B.      Requests for Production 32 & 33

In these two discovery requests, Factory Mutual seeks discovery regarding policy commentary that Factory Mutual generated for its Global Advantage Policy subsequent to the policies at issue.  The commentary discusses the definition of the term "occurrence" that was added to the Factory Mutual policies issued to WBI after 2006.  It states, in part, the following:

The following term wherever used in this Policy means:

A.     Occurrence:

The sum total of all loss or damage of the type insured, including any TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

* * * *

Defining an occurrence based on a "discrete event" emphasizes the requirement of physical loss or damage and the concept of an identifiable event fixed in time and place. The definition focuses on the insured physical loss or damage arising out of or caused by a discrete event.  This approach is consistent with the Company's past adjustment practices and the content of its policy workshops.

It is the Company's view that cumulative, progressive loss or loss due to repeated exposures to the same general conditions, such as long-term water intrusion into an

> Insured's building constitutes multiple Occurrences, and a deductible limit would
> typically apply to each Occurrence.

(Doc. No. 44-6, p. 10).  Also, the commentary goes on to offer illustrations of what it would consider

to be single and multiple occurrences.  (Doc. No. 44-6, p. 11).

Factory Mutual objects to the requested discovery on the same grounds discussed above with

respect to Requests 30 & 31.  And, for the same reasons, the court overrules the objections and

concludes that the requested discovery might lead to the discovery of relevant information.

However, the court believes the particular requests are overbroad and limits them as set forth below.

Factory Mutual is **ORDERED** to produce documents responsive to Requests for Production

32 & 33 (except those that are attorney-client privileged) that discuss: (1) the meaning of the term

"occurrence;" (2) the subject of single or multiple occurrences; (3) the possibility of there being

multiple interpretations of, or an ambiguity in, the term "occurrence;" (4) the reasoning for the

addition of a definition of the term "occurrence;" or (5) the commencement or duration of coverage

occasioned by an occurrence.  These documents shall be produced within 20 days.

### C.      Requests for Production 24 & 26 and Interrogatories 10 & 12

In Requests for Production 24 & 26 and Interrogatories 10 &12, WBI seeks to discover all

claim determinations and litigation proceedings dating back to 2000 (both court and arbitration)

involving first party coverage where the number of occurrences were in dispute.  In Interrogatory

No. 24, WBI requests that Factory Mutual list the litigated cases by title and number, provide the

factual circumstances of the claimed property loss, state Factory Mutual's position regarding the

number of occurrences, and provide the grounds relied upon by Factory Mutual for its position.  In

Interrogatory 26, WBI requests that Factory Mutual provide with respect to each claim

determination the identity of the claimant, the nature of the property loss, its position regarding the

16

number of occurrences, and the purported basis for its position.  Finally, in Requests for Production 10 & 12, WBI seeks all documents that address the number of occurrences in the claim determinations and litigated cases identified in the responses to Interrogatories 10 & 12.

Factory Mutual makes several objections to the discovery requests.  It argues that it will be prevented from disclosing much of the requested information because of confidentiality agreements it has with its customers.  It argues that the requested information is irrelevant because each claim is fact specific and subject to differing state laws.  Finally, it argues that compliance with the requested discovery would be an extraordinary task and unduly burdensome in part because it has no searchable database containing the requested information and that complying with the discovery requests would require hundreds of individuals to physically retrieve and  review hundreds of thousands of claim files, both foreign and domestic.

This is not the first case in which an insured has sought far-reaching discovery of an insurance company's treatment of claims of other policy holders, arguing that the information is relevant either to the construction of disputed policy language or to claims of  "bad faith,"or both, and the insurance company has objected to the discovery on or more of the same arguments that Factory Mutual makes here in response.  Unfortunately, there is little uniformity in the cases as to how much, if any, such discovery should be allowed.

Some courts have permitted discovery similar to what is proposed here.  E.g., Westport Ins. Corp. v. Wilkes & McHugh, P.A., 264 F.R.D. 368, 371-373 (W.D. Tenn. 2009).  Other cases have upheld objections to the requested discovery on the basis that the requested information is either of marginal or no relevancy, at least under the particular circumstances of the case.  Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 2007 WL 3376831, *5 (S.D. Ohio Nov. 9, 2007;

St. Paul Reinsurance Co. v. Commercial Fin. Corp., 197 F.R.D. 620, 644 (N.D. Iowa 2000);  Clark Equip. Co. v. Liberty Mut. Ins. Co., 1995 WL 867344, **3-4 (Del.Super. April 21, 1995). Also, some of the these cases have expressed concern over the disclosure of confidential information of other insureds.  However, in most of the cases, this was not the exclusive grounds for denying the discovery.  See id.  Still other cases have agreed that the evidence may be relevant, but have upheld objections on the grounds that the burdens of the proposed discovery are disproportionate to the potential benefits.  E.g., Leksi, Inc. v. Fed. Ins. Co., 129 F.R.D. 99, 105-106 (D.N.J. 1989).  Finally, still other courts have permitted some discovery, concluding that the evidence may be relevant, but have imposed limits on the discovery because of the burdens imposed. E.g., Sunnen Products Co. v. Travelers Cas. and Sur. Co. of America, 2010 WL 743633, ** 2-4 (E.D. Mo. Feb. 25, 2010); Nestle Foods Corp. v. Aetna Cas. and Sur. Co., 135 F.R.D.101, 107 (D.N.J. 1990); Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co., 117 F.R.D. 283, 286-287 & n.3 (D.D.C. 1986).

Turning first to Factory Mutual's objection that confidentiality agreements with its insured foreclose production of the requested information absent their consent, the court rejects the contention that private contractual obligations of confidentiality trump a party's legal obligation to respond to discovery.[6]  That is not to say, however, that the other insureds' expectations of  privacy as well as Factory Mutual's interest in not having to unnecessarily disclose commercially sensitive information are not relevant considerations.  But, there is no reason to believe that these concerns cannot be adequately addressed by a combination of  limiting the scope of what WBI is requesting and Factory Mutual being permitted to redact identifying customer information or use the existing

---

[6]  Also, the court's experience is that most confidentiality agreements provide an exception for when a party is obligated by law or court order to turn over the confidential information.

confidentiality agreement, or both.  See, e.g., Hart v. Nationwide Mut. Fire Ins., ___ F.R.D. __, 2010

WL 2869526, *5 (D. Del. 2010); Nestle Foods Corp. v. Aetna Cas. and Sur. Co., 135 F.R.D.at 107.

 With respect to Factory Mutual's claim of undue burden, the court would have preferred one

or more affidavits from persons with knowledge in support of its arguments.  But here, the enormity

of the task of complying with the WBI's discovery requests as they have been broadly framed is

obvious.  See, e.g., Hart v. Nationwide Mut. Fire Ins., 2010 WL 2869526 at *2; Independent

Petrochemical Corp. v. Aetna Cas. & Sur. Co., 117 F.R.D. 283, 286 n.2 (D.D.C. 1986).

 Finally, with respect to  Factory Mutual's relevancy arguments, the court rejects the

sweeping conclusion that information regarding the handling of other similar claims is not relevant

because each claim determination is based on upon facts and may influenced by differing state laws.

This argument is contrary to our common law experience and also Factory Mutual's own policy

commentary in which it offers examples of single and multiple occurrences.  For many of the

reasons discussed above with respect to the other discovery requests at issue, the court agrees with

the cases that have concluded that evidence regarding insurers treatment of other insureds is

relevant (at least in the broad sense contemplated by Rule 26) to the construction and application

of the disputed policy language as well as to claims of "bad faith."

 But, simply because information may be relevant does not mean it is always discoverable.

The 1983 amendments to Rule 26 were enacted, in part, to address excessive and disproportionate

discovery of matters that would otherwise be the subject of proper inquiry.  E.g., Leksi, Inc. v. Fed.

Ins. Co., 129 F.R.D.  at 105-106; Fed. R. Civ. P. 26, *advisory committee's note to 1983 revisions.*

Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii) explicitly authorizes the court to impose limitations on matters

that are otherwise discoverable if the court concludes that the burdens or expense of the proposed

discovery outweigh the likely benefit after considering a broad set of factors, including the needs of the parties, the amounts in controversy, the resources of the parties, the importance of the issues at stake, and the alternatives for obtaining the same or comparable information.

After considering in this case the particular issues in dispute (including the fact that the discovery may be relevant to both the construction and application of the disputed policy language and the claim of "bad faith"), the relatively large amount in controversy, the fact that WBI has made a sufficient threshold showing of the substantiality of the issues in dispute, and the alternatives for obtaining the same or comparable information (including the fact that the court is permitting discovery with respect to the changes in the policy language and policy commentary), the court reaches the following conclusions:  First, WBI's request for all cases and prior claims in which the number of occurrences has been an issue is overbroad.  WBI has not demonstrated that all such cases and claims would be sufficiently analogous to the case here such that any potential benefit outweighs the burdens of the discovery.  For example, the court concludes this to be the case with respect to prior claim determinations involving property damages or losses caused by natural events.  Second, the court concludes that, even after a narrowing of the prior claims by subject matter, an inspection of each individual claim file in a hunt for cases where multiple occurrences might have been an issue is not justified by the burden in time and expense.  Third, the volume of information that WBI is requesting, particularly with respect to the interrogatories, is likely to take months to complete and significantly delay the trial of this case.

Consequently, in lieu of responding to WBI's Requests for Production 24 & 26 and Interrogatories 10 and 12 as framed, it is **ORDERED** as follows:

1.     The responsive information that Factory Mutual shall be obligated to provide is

limited to litigated cases (both court and arbitration) and claim determinations where

(a)  the number of occurrences was in dispute, (b)  the coverage was first-party

property or casualty coverage, and (c) the property loss or damage was the result of

one or more volitional acts on the part of the person or entity causing the loss,

including, but not limited to, theft, conversion, misappropriation, vandalism, arson,

and terrorism.[7]  The court concludes these types of claims are more analogous than

others, recognizing, however, that others may also have some relevance but that the

potential is less and that discovery with respect to such claims has not been

demonstrated to be sufficiently beneficial so as to outweigh the burdens imposed.

Further, the time period will be shortened from beginning with the year 2000 to

beginning with the year 2003, but including all litigated cases and claim

determinations that were still pending or unresolved as of January 1, 2003, such that

---

[7]  This is somewhat broader than what court may have suggested court during the hearing on the pending motions.  For example, while no ruling is made regarding the relevancy or the admissibility of the computer sabotage claim referenced by WBI, the court is not prepared at this point to conclude that it and similar claims (like the 9/11 attacks on the twin towers of the World Trade Center) are of no possible relevance.  In the computer sabotage case, Factory Mutual took the following position with respect to 171 instances of sabotage committed by the same person against an insured's computer system in slightly more than a year's time in a letter to its insured dated June 30, 2003:

> **III.     Multiple Occurrences/Multiple Deductible:** Clearly * * * ("HBL") "sabotaged" the system on a number of different occasions.  By * * * [the insured's] count, there are at least 171 documented instances of "sabotage" occurring from August 31, 2000 through September 10, 2001.  Regardless of whether or not there is a business interruption loss, any recoverable loss from each occurrence would be subject to a $10,000,000 deductible (refer to page 4 of the policy).  * * * *
> * * *[The insured] contends that there was one occurrence due to a "single actor," a "continuous pattern of activity," "activity . . . of a substantially similar nature" with "two contemporaneous motivations."   As we have set forth, the evidence, including HBL's statements and deposition, evidences that he was motivated by a variety of perceived insults and slights.  *The critical fact is that there were a number of sabotage events occurring over an extended period of time, and each event occurred independently of the others.*  Therefore, while each event of sabotage represents a potentially covered occurrence (subject to all other policy terms and conditions), the recoverable loss (if any) from each event would be subject to the $10,000,000 deductible.

(Doc. No. 44-12, p.4) (emphasis added).

responsive information generated prior to January 1, 2003 in those cases and claim determinations must be produced.

2.     The court will not require at this point that Factory Mutual generate the information requested by Interrogatories 10 & 12.  At least for now, the court will limit Factory Mutual's obligation to providing the following documents from litigated cases and claims within the purview of that set forth above and that substantively address the number occurrences as an issue:

        a.     Briefs and affidavits filed with the court or the arbitrators and letters sent to another party or to the arbitrators.

        b.     Letters sent to the insured accepting or declining coverage.

        b.     Internal documents discussing the issue of multiple occurrences, except for those protected by the attorney-client privilege.

Also, at least for now, Factory Mutual may redact customer information as well as confidential information that is not relevant to any issues in the case.  The court, however, questions the applicability of any claim of work-product privilege.  If Factory Mutual intends to make such a claim with respect to any document, it shall collect the responsive document to the court *in camera* for a ruling.

3.     Factory Mutual will not be required to inspect each claim file to hunt for instances in which the number of occurrences was in dispute.  Factory Mutual has not demonstrated, however, that responsive information, even though incomplete in terms of WBI's initial requests, may not reside elsewhere.  Also, making the queries and inspections that will be required  as set forth below may lead to the identification

of individual claims files that contain responsive information and, to the extent that is the case, the individual claim files are then to be searched for the responsive information.  In this context, Factory Mutual is required to make the following queries and inspections both for the purpose of providing information that is responsive within the  parameters set forth above, but also for the identification of individual claim files that may contain the responsive information which will then need to be reviewed:

      a.     A query to all in-house counsel for their recollections of specific claims and/or the location of responsive documents, as well as a search of their own working files and records and the files and records of each of their departments, short of an initial examination of each individual claim file, for responsive documents and claim files containing responsive documents.

      b.     A search of the legal files of the firm Robins, Kaplan, Miller & Ciresi.[8]

4.     The court is not foreclosing the possibility of requiring that Factory Mutual make a broader examination, e.g., a similar query to all of its adjustors in the United States for an examination of their working files other than the individual claim files, but that will depend upon the continued needs of the parties for the discovery in light of what may be produced as ordered here.  Also, the court is not foreclosing additional

---

[8]  The Robins firm is representing Factory Mutual in this litigation and the court observes that it was likely involved in another claim referenced by WBI involving computer sabotage.  (Doc. No. 44-12, p. 6).

targeted requests for discovery from individual claim files, even dating back before 2003, to the extent that the permitted discovery mentions or references the earlier claims and the potential benefits of the discovery appear to outweigh the burdens. Finally, although the court is limiting the discovery to certain specified documents, the court is not foreclosing more targeted requests for additional information.

5.    Factory Mutual shall provide responsive discovery within the purview of the foregoing with respect to the computer sabotage claim, Loss No. 04070-01-39-01.

6.    The discovery ordered here shall be responded to within 30 days.

## IV.   **CONCLUSION**

The motions to compel by Factory Mutual (Doc. No. 38) and WBI (Doc. No. 44) are **GRANTED IN PART** and **DENIED IN PART** in accordance with the foregoing.

Dated this 20th day of August, 2010.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court